and Maryland Area Teamsters and Employees Pension Fund, and so on. Mr. My name is Vincent Slego. Slego, that's what I was going to say. Mr. Slego? Good morning, Your Honors. I'd like to request five minutes of my time for rebuttal. That request will be granted. Good morning. I represent a multi-employer pension fund, Southwestern Fund. And this dispute arises because a contributing employer in the Southwestern Fund withdrew. And under the provisions of the Employee Retirement Income Security Act, ERISA, as amended by the 1980 provisions of the Multi-Employer Pension Plan Amendments Act, which I call MEPA, the fund determined that the transaction associated with the withdrawal was one that fit within Section 1392C of ERISA. It was, in the fund's determination, a transaction having a principal purpose of evading or avoiding liability under this part. This section, and the Court is well aware of withdrawal liability under MEPA, that statute having been enacted 27 years ago. So we come to this Court with a long history of cases and considerations. The Court is well aware of the policy of MEPA to protect the funding of the pension funds. And with that in mind, also the disputes under this section are relegated to arbitration. Here, in this case, after the assessment was made, it was arbitrated by an arbitrator selected by the two parties from a special panel of qualified MEPA arbitrators. The facts surrounding this transaction were largely undisputed, and the arbitrator set forth the facts pretty fairly in his decision, as did the magistrate judge and the district court judge. Let me ask you a question. If, back in March, SuperValue, seeing the difference in withdrawal between the two years, had decided we are going to get this whole thing closed up and finished and out of here before June 30th, and had not renegotiated the collective bargaining agreement, had simply gotten everything resolved, closed down the plant, ended the employment of the covered employee, would you be here today? I think that would be a much tougher case. I can't say whether we'd be here today. We've recognized in the brief it would be a very tough case, because we view this case under the unique facts and circumstances and the timing of this case, and urge the court not to engage in overgeneralizations or to strike a rule that applies beyond the unique facts of this case. And we note that this is what this court has done in the Dorns case. This court has recognized the uniquely factual nature of any dispute involving evade or avoid, and it looks at a transaction. Now, in respect to your question, Your Honor, the shutdown of an operation, I have a difficult time saying that shutting it down was a transaction, whereas in our case we do have a transaction because we have an offer and an acceptance. We have an offer that was made and accepted on May 31st and June 1, which was approximately one month before the end of the plan year. Of the new CBA? Of the new plan year, yes, of the new CBA, that's correct. And yet there was a perfectly valid CBA in place, so there's no ostensible need to get a new CBA. That's correct. At that point in time there was a valid CBA in place, and this transaction altered the existing rights that employees had under that CBA. And in addition, it was entered into in the circumstances where the union members who voted to accept it had two weeks previously been served with a warn notice indicating that the facility would close in mid-July. So you have a situation there where you have a very unique timing pattern that is there. You have all parties to the transaction aware that the impact of their transaction will allow the employer to escape liability, and you have an agreement to share the savings. These are all factors that put this case squarely in line with Dorn's. I think this Court has to harmonize its decision in this case with Dorn's. Now, when we went into the arbitration, SuperValue, the fund, and the arbitrator all felt that the decision would turn on Dorn's. The District Court felt it was not relevant and relegated discussion to Dorn's to a footnote saying it was based on different facts. Well, any time you have an evade or avoid case, it's always going to be intensely fact-specific. We've seen that in all these cases. In Dorn's, I think the important factor in Dorn's that you have to focus on and you cannot be diverted from is that Dorn's talks about a bad faith element or a good faith element. It deals with the two of them, good faith, bad faith, in the same breath. But it looks not to how the parties to the transactions treat each other or whether they treated each other fairly. It talks about did the two parties conspire to eliminate payments or reduce liabilities to the fund. So when they're talking about good faith, they're looking to the impact on the fund and the party's awareness of what that transaction will do to the fund. They're not talking about whether the conspirators treated each other fairly. And I think that that is a key point that this Court has to harmonize with this. Now, Your Honor, you were on the panel in the white consolidated cases, which I feel is highly relevant to the decision here. That was a case involving a single employer plan with a dispute under 1369, a section which is very analogous to the situation here. It deals with transactions where one of the parties, not to one party, intends to enter into any transaction to evade liability within five years. The wording's slightly different, but for the most significant part, it's very relevant. And in the white consolidated case, the decision in 2000, the Court noticed that the transaction, to a large extent, involved a lot of arm's length dealing. It did not look to see if the transaction was a sham. It said it did not need to do that. It looked merely at the fact that the parties were aware of liability and purposely structured their transaction to minimize exposure to the liability. And that's pretty much a direct quote from the decision, minimize exposure to the liability. Not directly on point, but I think in an effort to harmonize this Court's determinations on protecting the funding of pension plans, whether they're single employers or multi-employer plans, you have to keep that in mind. Mr. Sligo, if we determine that there was a violation of Section 1392C, is there enough in the record or do we need to remand this case to make a determination as to when the actual withdrawal date was? The arbitrator made a specific finding that the withdrawal took place in the new plan year. Is that enough? That is enough. The withdrawal would have taken place when the facility closed, and we know from the record and from the stipulations and the statements in the brief that most of the employees were terminated by the end of July, which was one month into the new plan year. This is precisely the timing that was included in the war notice that was given to the employees two weeks before they entered into this transaction, authorizing this premature cessation of contributions to the fund. I think my criticism of the lower court's decision is that the lower court attempts to overly generalize the de facto situation and observes that this is a transaction arising out of collective bargaining agreement. So the way that the district court holds, I think it's an overly broad and dangerous ruling because that would mean any time you get a union to rubber stamp a transaction, it would be a safe harbor and that you would not even examine the transaction under 1392C. I think that's overly broad. I think what you need to do is look at the unique factual pattern in this case because that is the way that the Dorns court analyzed that decision. And you follow the same sort of analysis. You look to see whether the parties were aware that what they were doing would be structured to reduce liability to the fund. And of that, there really can be no question. The arbitrator quoted portions of the record that very clearly indicate that the parties knew what they were doing. Thank you, Your Honor. Does the record indicate or did the arbitrator find whether or not the union that represented the employees of SuperValue, whether or not that same union represented any of the other employees who were part of the fund? No, there's nothing in the record dealing with that. I'd be remiss to tell you that on my personal knowledge. If it's not in the record, then it's not relevant. Yeah, I won't. It's not in the record, and I don't know that that would be relevant. Thank you. Mr. Christina? Yes. Good morning, Your Honors. My name is Tom Christina. I represent SuperValue, Inc., in this proceeding. I thought it might be best. Let me ask you, Mr. Christina, the same question I asked you earlier. Why was there any need when there was a perfectly balanced collective bargaining agreement to negotiate a new collective bargaining agreement other than the effort to avoid liability to the fund? The record indicates that when the effects bargaining began was required under the National Labor Relations Act, there was some concern about the possibility of employees prolonging the shutdown process. And so as they got further and further into negotiations, SuperValue kept raising this issue, and ultimately it was agreed that there would be an orderly shutdown, the actual phrasing of the new collective bargaining agreement, in exchange for certain consideration, part of which was enhanced severance, part of which was a higher wage package. And on the union side, part of which was agreeing that contributions to the plan would cease. But that was always something that the parties could have chosen to do, even outside the context of closing the facility. This collective bargaining agreement provided that the parties could renegotiate at any time, and so they would be free to do that in any event. This particular multi-employer plan doesn't have a rule that prohibits those agreements or causes them to become ineffective for purposes of the contribution obligation. So the contribution obligation could have ceased at any time. And, in fact, that was, in a way, I thought the point of Your Honor's question to Mr. Slago, what if SuperValue had simply shut down the plan? We know from the statute that that would have caused a complete withdrawal. And we know that that would have been a zero liability withdrawal. So why, in what sense is the fund harmed with respect to any of its legal rights if instead of shutting down during the middle of a year, it continues to contribute until close to the end of the year, and then ceases contributions? Because we have the statute, and the statute provides that if there are transactions which are simply negotiated to avoid or evade liability, that they are nonexistent. And if this transaction is simply to time the cessation of covered employment to be able to withdraw in one year as opposed to another year, doesn't that absolutely fit within the language of the statute? I don't think it does, Your Honor, because in that situation there is no liability because the withdrawal has occurred during a year in which there weren't. But operations are continuing, which but for the renegotiation of the CBA would be covered operations. That is certainly true. There are other circumstances in which they wouldn't be covered as well, decertification, for example. The statute just seems to be very clear that the liability arises only in accordance with the statute's terms. And so any cessation of either the obligation to contribute or a cessation of covered operations triggers a complete withdrawal. Yes, but when we're faced with the fact that a withdrawal in the 2002 year means zero withdrawal liability and a withdrawal one day after or one day into the 2000-2003 year would amount to higher withdrawal liability, a significant withdrawal liability, how can factually we ignore those facts in looking at the negotiations to determine whether or not the transaction was structured to evade or avoid? I'm not asking the Court to overlook the facts. I think instead what I'm saying is that really regardless of the motivations of the parties, if the parties lawfully ceased the obligation, caused the obligation to contribute to cease, that is a withdrawal, and that means the withdrawal occurred in the 2001 plan year. But they caused the obligation to cease although operations were continuing, and they even paid off the other side to get them to agree to sign the agreement. I mean, $2,600 separation, $2.50, $2 more an hour, there was some consideration for closing down the covered operations. And if they could have closed them all down before the end of June, I think it's one story, but the fact that they couldn't close them all down, they created an agreement that got them in the previous year with no liability rather than the next year. And if I look at the language of the statute, it seems to be absolutely covered by that language. It is a transaction to evade or avoid liability. I think I may understand better the tenor of the questions. Your Honor said that they couldn't shut down earlier than July. There is actually no finding to that effect in the award, and there's no reason to believe that SuperValue could not simply shut down whenever it pleased. And, in fact, there's some hint of that in the negotiating notes that are part of the record. So SuperValue had it within its power to unilaterally terminate covered operations during the no liability year. It may have been better for all concerned to continue those operations, but that doesn't mean that SuperValue lacked the legal right to cease operations. They could have ceased back in March. They were only required to negotiate over the effects of their decision to shut down, not over the right to shut down. And that, I think, is what distinguishes this from the case that the arbitrator thought he was deciding, which was a case that I think he thought that there was some basis to conclude that there was some hypothetical withdrawal date in the future against which he could compare the facts as they transpired. And that assumption, I think, is clearly wrong. Well, isn't there – I think the WARN Act is somewhat of a red herring, but at the same time, the employer, SuperValue, must have known of the existence of the WARN Act and of the fact that it had to give 60 days' notice of termination of operations. And the WARN Act notice was given, what, May 14th, May 15th? I think it's mid-May, yes. Which would seem to envision a mid-July closing. And then someone says, oh, my God, that puts us in the next year. We've got to somehow get things closed down. So you're faced with violating the WARN Act or getting your fund liability computed in a later year. And don't you then indulge in these negotiations, which will, quote, terminate your liability in the fund earlier, but with the realization that you're going to continue working there into mid-July. And isn't that agreement then simply a way of evading or avoiding the liability to pay the withdrawal? I think in that scenario, it's difficult to say whether it's evading or avoiding withdrawal liability or whether it's ensuring compliance with the WARN Act. But as I understand the WARN Act, and I think we said this in our brief, even if SuperValue was late in getting its WARN Act notice out, that doesn't mean that it couldn't shut down the facility. True. The WARN Act. It may be an indication of some thought, well, we'll need 60 days, let's give the notice now. That is a possibility. On the other hand, it's equally possible that the announcement in March of that year that the facility would be closed down was intended to signal to the workforce, look, this is definitely coming, this is definitely coming in the near future. But that announcement indicated the shutdown would be in the summer. Yes, Your Honor. After June 30th. I'm not sure that announcement said that it would be after June 30th. I do know that it said sometime in the summer. When you think of summer, since summer starts June 21st, I think you more typically think of it in July, August. It may be a geographical question now that I live in South Carolina. I can see the different thinking. But up here you don't think of summer until at least the end of June and then July and August. The point remains that really nothing happened here that deprived the fund of any rights that were secured to it because it was at risk that either there would be a decertification or the facility would shut down or the parties would bargain out of the agreement or the parties would bargain to begin contributing to a different multi-employer pension plan. Any of those things could have happened under this agreement at any time. That's true, but so too if the shutdown had been after June 30th of 2002, which SuperValue had the right to do. No one was telling them they couldn't close down after that. The only difference for SuperValue would be, and they knew it, there would be a substantially higher withdrawal liability. What I'm trying to point out in my questioning is the facts in this case seem to dictate that we have a 1392C circumstance where it appears to be a transaction to evade or avoid withdrawal liability. If that's the case, then where does that principle stop? For example, in the next case, if the shutdown is scheduled for June 29th and a company is presented with the opportunity to continue operations for two weeks, would declining that opportunity be a transaction to evade or avoid liability? Well, that wouldn't be a transaction. That wouldn't be a renegotiation of a collective bargaining agreement. If an employer acquires… Actually, we're supposed to ask the questions. I'm sorry. Well, let me put this in the form of a statement then. I'm afraid I don't see any limiting principle to that approach because I can imagine circumstances that clearly involve transactions that would fall under that analysis, and yet I think we'd all realize they weren't intended to come within the statute. Let's get things right. We didn't develop the approach. Congress did, and Congress did to protect these multi-employer funds. And so that's what we're looking at. What Congress intended, what does the language say, and that's where this case is. Yes. Let's imagine that an employer has lost more than 70% of its workforce, unionized workforce, so that unless it takes some action, it will suffer a 70% contribution decline, which is a partial withdrawal. If it acquires another unionized company that contributes to that multi-employer pension plan with the intention of avoiding a 70% decline partial withdrawal, I think Congress would not want that to be considered a transaction to evade or avoid withdrawal liability and to be overlooked in the assessment. Once again, I think you're asking us a question, and those aren't the facts of this case. That is certainly true, Your Honor. As I asked Mr. Slato, if SuperValue had been able to close down everything before the end of June, wouldn't that have been acceptable under the Act? He didn't want to commit on it, but it seems to me that there would not be a transaction other than closing down, which I don't think you can stop the employer from closing down. Yes, Your Honor, I agree. And I think that by the same token, you can't stop them from agreeing to circumstances under which they can exercise that right to close down, even if one of the agreements is to cease contributions. Thank you, Your Honor. Mr. Slago. Thank you, Your Honor. I reserve five minutes for rebuttal, but I'll open myself up for questioning before I go on if you have any questions of me. If not, I'll just briefly say that SuperValue's argument was essentially that anything that is agreed to out of collective bargaining is simply not within the scope of 1392C. And we don't think that the case law supports that. We think that there are very few cases that have dealt with transactions arising out of any kind of collective bargaining. The Kayamaka Meats, the ITU Fort Worth Star case are two, the only two I can think of. And the point to be made there is that any time you look at one of these transactions, you have to be cognizant of the unique facts of that case and engage in a very extensive factual consideration, which is what the arbitrator did and that's where the expertise lies and that the court should pay attention and give some deference, I don't know how much, but some deference to the superior expertise of the arbitrator. Well, what about Kayamaka Meats and ITU? Mr. Christine is hypothetical. What if the earlier year was the liability year and the later year was the no liability year and where SuperValue first closed down in mid-June and then it saw, well, if it could hang on into July, it would have no liability for the funds. Would you agree that ITU and Kayamaka Meats should apply and that there would be no liability even though the continuity, continuation of operations was strictly, was obviously simply to avoid the liability? Yeah, I'm not quite sure I agree that the fact pattern would work out the way that you've posed, Your Honor, because I think if in the last year it was, if the last year was an up year, I think my understanding of the statute is that the withdrawal liability by going on into the next plan year would always be lower in an up year. So I don't know that I could agree with you. I think in both of those cases, they're basically equitable exception type cases where the arbitrator in the ITU Fort Worth case and the Ninth Circuit in Kayamaka Meats saw that there would be a windfall because there was no harm, that contributions were continued so that the employer could reap the benefit of the annual allocation that takes place at the end of the plan year, which would have been a credit towards their withdrawal liability and that that's not avoiding liability, that's just getting what you're entitled to because you were in the fund for the whole year. The super value would like to pose a lot of hypos, but I think you have to decide this case on its facts. Not be concerned with the slippery slope. We cited that in our reply brief. That's a very interesting doctrine. Sometimes courts want to make a general rule that applies to all situations, but I believe your role is to decide the facts of this case without undue consideration for how your holding would be applied if the facts were different because any time you have another case, the facts are going to be different and each case has to be analyzed individually. So the slippery slope argument is a red herring in my opinion. I have no further comments. Thank you, Mr. Sligo. Thank both counsel for their arguments and we'll take this matter under advisement.